UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

AARON HARDY,

                                            Plaintiff,      **PLAINTIFF'S COMPLAINT AND JURY DEMAND**

              -against-

                                                    **22-cv-1334**

THE CITY OF NEW YORK, LIEUTENANT ERIC DYM,
SERGEANT NATALIE BAUTISTA, SHIELD NO. 1127,
OFFICER LORVIN FERNANDEZ, SHIELD NO. 9421,
OFFICER JOSE TEJADA, SHIELD NO. 6150
                                        Defendants.

------------------------------------------------------------------------ x

## **PRELIMINARY STATEMENT**

1. This is a civil rights action in which plaintiff seeks relief for the violation of his rights secured by 42 USC §1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

2. The claims arise from April 16, 2019 and April 27, 2019 incidents, in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiff to detention without probable cause, false arrest, malicious prosecution, and violations of New York State Law.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## **JURISDICTION**

4. This action is brought pursuant to 28 U.S.C. §1331, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5. Venue is laid within the United States District Court for the Southern District of New

York in that Defendant City of New York is located within, and the events occurred within, the boundaries of the Southern District of New York.

## PARTIES

6. Plaintiff Aaron Hardy is a resident of Dutchess County in the State of New York.

7. The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

8. Lieutenant Eric Dym, Sergeant Natalie Bautista, Shield No. 1127, Officer Lorvin Fernandez, Shield No. 9421 and Officer Jose Tejada, Shield No. 6150 are individual NYPD officers involved in the detention of Plaintiff. Defendants Dym, Bautista, Fernandez and Tejada were at all relevant times police officers of the NYPD, and as such were acting in the capacity of agent, servant and employee of the City of New York. On information and belief, defendants Defendants Dym, Bautista, Fernandez and Tejada were involved in the illegal arrest and prosecution of Plaintiff and/or failed to intervene in the actions of their fellow officers. Defendants Dym, Bautista, Fernandez and Tejada are sued in their individual capacities.

9. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

**FACTUAL ALLEGATIONS**

10. On April 16, 2019 at approximately 1 pm Plaintiff was in the vicinity of 720 Courtlandt Avenue, Bronx New York.

11. Plaintiff was walking when he was stopped by defendants Dym and Baustista.

12. Plaintiff was not committing any crime, nor was there probable cause or reasonable suspicion to believe Plaintiff was a committing any crime.

13. Defendants Dym and Bautista demanded to search Plaintiff.

14. Defendants Dym and Bautista took Plaintiff to a police precinct.

15. Defendants Dym and Bautista searched Plaintiff at the police precinct.

16. No contraband was recovered from Plaintiff during the search.

17. Defendants Dym and Bautista issued Plaintiff a summons ticket alleging he committed disorderly conduct.

18. Plaintiff was released from custody after several hours.

19. The summons ticket issued to Plaintiff was dismissed on June 10, 2019.

20. On April 27, 2019 at approximately 6 pm Plaintiff was in the vicinity of Park Ave & E 159th St. Bronx, New York.

21. Plaintiff observed defendants Dym, Bautista, Fernandez and Tejada effecting a stop of another individual.

22. Plaintiff began filming the officers on his phone as they stopped the other individual.

23. Plaintiff was not interfering with the officers' activities.

24. Defendants Dym and Bautista approached Plaintiff and spoke to Plaintiff in an aggressive manner.

25. Defendants Dym and Bautista threatened Plaintiff with arrest for filming the officers.

26. Defendant Dym ordered Plaintiff to "put the phone down."

27. Defendants Dym and Bautista seized Plaintiff and arrested him.

28. Defendants Fernandez and Tejada were present and observed Defendants Dym and Bautista approach Plaintiff as he filmed the officers, threaten him and arrest him.

29. Defendants Fernandez and Tejada did not intervene in the illegal actions of Defendants Dym and Bautista.

30. Defendants took Plaintiff to a police precinct.

31. Defendants issued Plaintiff a summons ticket alleging he committed disorderly conduct.

32. The summons ticket issued to Plaintiff was dismissed on June 14, 2019.

## DAMAGES

33. As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

   a. Violation of his rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution to be free from an unreasonable search and seizure;

   b. Loss of liberty;

   c. Violation of his rights to record law enforcement related activities pursuant to N.Y. Civ. Rights Law § 79-p,

   d. Emotional trauma and suffering, including fear, depression, embarrassment, anger, humiliation, frustration, extreme emotional distress, extreme inconvenience, anxiety, and other forms of mental distress.

## FIRST CAUSE OF ACTION
(42 U.S.C. § 1983 – as to Defendants Dym and Bautista on April 16, 2019)

34. The above paragraphs are here incorporated by reference.

35. On April 16, 2019 Defendants Dym and Bautista deprived plaintiff of his civil,

constitutional and statutory rights under color of law and are liable to plaintiff under 42 USC § 1983.

36. Defendants' conduct deprived plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.

37. Defendants seized Plaintiff without probable cause.

38. Defendants' conduct deprived plaintiff of his right to due process of law, pursuant to the Fourteenth Amendment to the United States Constitution.

39. Defendants fabricated evidence against Plaintiff by falsely alleging that he committed conduct amounting to disorderly conduct.

40. Defendants failed to intervene to prevent the violation of Plaintiff's rights by their fellow officers.

41. Plaintiff was damaged as a result of defendant's wrongful acts.

## SECOND CAUSE OF ACTION
(42 U.S.C. § 1983 – as to All Individual Defendants on April 27, 2019)

42. The above paragraphs are here incorporated by reference.

43. On April 27, 2019 Defendants deprived plaintiff of his civil, constitutional and statutory rights under color of law and are liable to plaintiff under 42 USC § 1983.

44. Defendants' conduct deprived plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.

45. Defendants seized Plaintiff without probable cause.

46. Defendants' conduct deprived plaintiff of his right to freedom of expression, pursuant to the First Amendment to the United States Constitution.

47. Defendants prevented Plaintiff from recording the officers' activities, an essential element of expressive activities.

48. Defendants' conduct deprived plaintiff of his right to due process of law, pursuant to the Fourteenth Amendment to the United States Constitution.

49. Defendants fabricated evidence against Plaintiff by falsely alleging that he committed conduct amounting to disorderly conduct.

50. Defendants failed to intervene to prevent the violation of Plaintiff's rights by their fellow officers.

51. Plaintiff was damaged as a result of defendant's wrongful acts.

### THIRD CAUSE OF ACTION
(N.Y. Civ. Rights Law § 79-p – as to Defendants Dym and Bautista)

52. The above paragraphs are here incorporated by reference.

53. On April 27, 2019 Plaintiff was exercising his rights pursuant to N.Y. Civ. Rights Law § 79-p to record police activity.

54. As a result of Plaintiff's attempt to record the officers, Defendants Dym and Bautista attempted to prevent Plaintiff, from recording law enforcement activity, threatened Plaintiff for recording a law enforcement activity, commanded that Plaintiff cease recording law enforcement activity, and ultimately stopped seized, searched, ticketed and arrested Plaintiff.

55. Plaintiff was damaged as a result of defendants' interference with Plaintiff's right to record.

### FOURTH CAUSE OF ACTION
(Respondeat Superior – As to City of New York)

56. The above paragraphs are here incorporated by reference.

57. Defendants' violation of N.Y. Civ. Rights Law § 79-p was undertaken within the scope of their employment by defendant City of New York and in furtherance of the defendant City of New York's interest.

58. As a result of defendants' tortious conduct in the course of their employment and in furtherance of the business of defendant City of New York, Plaintiff was damaged.

59. The City of New York is responsible for the tortious conduct of its employees in this matter by reason of *respondeat superior*.

**FIFTH CAUSE OF ACTION**
(Municipal Liability – As to City of New York)

60. The above paragraphs are here incorporated by reference.

61. The City is liable for the damages suffered by plaintiff as a result of the conduct of their employees, agents, and servants, in that the City has created a policy or custom under which unconstitutional practices occur regularly and allows such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event. The City has been alerted to the regular occurrence of false arrests by its law enforcement officers, but has nevertheless exhibited deliberate indifference to such false arrests; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case.

<u>The City Was Aware That The Individual Defendants Routinely Violated The Rights Of Individuals as Members of the NYPD</u>

62. The City has long been aware that the particular officers involved in the violations of Plaintiff's rights were unfit for duty.

63. Eric Dym has been the subject of 23 civilian complaints made to the Civilian Complaint Review Board (CCRB), dating back to 2005. Those 23 CCRB complaints include 60 allegations, at least 16 of which were substantiated by the CCRB.

64. Defendant Dym has also been named as a defendant in 15 prior lawsuits alleging misconduct in his duty as a police officer. Eight of these lawsuits have resulted in settlements which resulted in Plaintiffs recovering a total of $1,358,006.

65. Upon information and belief, Defendant Dym has received only minor disciplinary action as a result of his past violations of the rights of civilians, including command discipline and additional training. The discipline Defendant Dym received for past infractions was insufficient to deter future misconduct by him.

66. Natalie Bautista has been the subject of 7 civilian complaints made to the CCRB, dating back to 2006. Those 7 CCRB complaints include 18 allegations, at least 2 of which were substantiated by the CCRB.

67. Defendant Bautista has also been named as a defendant in 6 prior lawsuits alleging misconduct in her duty as a police officer. 6 of these lawsuits have resulted in settlements which resulted in Plaintiffs recovering a total of $407,500.

68. Upon information and belief, Defendant Bautista has received only minor disciplinary action as a result of her past violations of the rights of civilians, including command discipline. The discipline Defendant Bautista received for past infractions was insufficient to deter future misconduct by her.

69. Lorvin Fernandez has been the subject of 2 civilian complaints made to the CCRB, dating back to 2019. Those 2 CCRB complaints include 5 allegations, at least 2 of which were substantiated by the CCRB.

70. Upon information and belief, Defendant Fernandez has received only minor disciplinary action as a result of his past violations of the rights of civilians. The discipline Defendant Fernandez received for past infractions was insufficient to deter future misconduct by him.

71. Jose Tejada has been the subject of 2 civilian complaints made to the CCRB, dating back to 2017. Those 2 CCRB complaints include 6 allegations, at least 3 of which were substantiated by the CCRB.

72. Defendant Tejada has also been named as a defendant in 4 prior lawsuits alleging misconduct in his duty as a police officer. 3 of these lawsuits have resulted in settlements which resulted in Plaintiffs recovering a total of $170,000.

73. Upon information and belief, Defendant Tejada has received only minor disciplinary action as a result of his past violations of the rights of civilians, including command discipline. The discipline Defendant Tejada received for past infractions was insufficient to deter future misconduct by him.

74. The City was aware of the past allegations of misconduct by these officers, but failed to take steps to prevent future misconduct by these officers.

### The Kinds Of Misconduct Which These Defendants Have Engaged In Are Routinely Tolerated By The City Fostering A Culture Where Officers Do Not Believe They Will Face Repercussions For Violating The Rights Of Civilians

75. The large number of previous complaints made against the individual defendants is not unique among the NYPD. The City has turned a blind eye to such Complaints, fostering a culture where officers believe they can act with impunity.

76. For decades the City has defended massive numbers of lawsuits alleging misconduct by its police force. For example, in 2012, New York City paid out over $131 million for the fiscal year, compared to 2011, when it paid out more than $166 million, and 2010, when it paid $128 million.[1] From 2000 to 2010 the City of New York paid nearly a billion dollars on lawsuits brought against the NYPD.[2]

---

[1] Mayor Michael Bloomberg's preliminary Management Report for FY 2013, available at http://www.nyc.gov/html/ops/downloads/pdf/pmmr2013/2013_pmmr.pdf, see page 6, last visited on June 25, 2013.

[2] "NYPD Has Paid Out Nearly $1 Billion in Claims Over Past Decade," by Associated Press Writers Colleen Long and Jennifer Peltz, http://www.law.com/jsp/article.jsp?id=1202473432953, October 15, 2010 last visited on June 25, 2013.

77. The widely held assumption is that civil rights lawsuits deter law enforcement misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. Wyatt v. Cole, 504 U.S. 158, 161, (1992) citing Carey v. Piphus, 435 U.S. 247, 254-257, (1978). "As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts." See Hudson v. Michigan 547 U.S. 586, 598 (2006) citing Correctional Services Corp. v. Malesko, 534 U.S. 61, 70 (2001) and Nix v. Williams, 467 U.S. 431, 446, (1984). "It is almost axiomatic that the threat of damages has a deterrent effect (citation omitted) surely particularly so when the individual official faces personal financial liability." Carlson v. Green, 446 U.S. 14, 21, (1980), citing Imbler v. Pachtman, 424 U.S. 409, 442, and footnote 6 (1976).

78. However, the City of New York has isolated law enforcement officers from accountability for civil rights lawsuits by indemnifying officers who violate the constitutional rights of citizens, and, as a result, is preventing civil rights lawsuits from having any deterrent value to the City, or its officers.

79. Civil rights lawsuits against law enforcement officers have no impact on the officers' careers, regardless of the expense to the City of the officers' lawsuit liability, even after multiple lawsuits.

80. In 1999, former Comptroller Alan Hevesi reported that there was a "a total disconnect" between the settlements of even substantial civil claims and law enforcement department action against officers. This "total disconnect" between officers' liability and official discipline, results in a system where the City pays vast sums to settle false arrest lawsuits, but does nothing to

investigate nor address the underlying causes of such false arrests or officers who have incurred large sums of civil rights liability.

81. The City has repeatedly resisted attempts to catalog even basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. The City's deliberate indifference towards the contents of civil rights litigation, towards individual officers repeatedly named in lawsuits, towards incidents repeatedly occurring in the same precinct, towards patterns of misconduct that arise in civil rights litigation has caused the constitutional violations against plaintiff.

82. According to a report of the New York City Bar Association issued in 2000, the City has isolated its law department from the discipline of law enforcement officers. Civil rights lawsuits against law enforcement officers have no impact on the officers' careers, regardless of the officers' responsibility in creating the misconduct with led to the lawsuit, even after multiple lawsuits. This remains true to the present.

83. The City's practice of insulating officers from accountability through private lawsuits is evident in this action. As described above, the individual officers in this action were named in multiple prior lawsuits. Such lawsuits had no impact on these officers individually, and thus provided no deterrent effect for these officers.

84. Moreover, the fact that the City routinely insulates all officers from accountability through private legal actions is well known to members of the NYPD, ensuring that these officers have no fear of facing civil consequences as a result of violating the rights of civilians.

85. The individual officers involved in Plaintiff's arrest felt they could violate his rights without any repercussions as a result of the City's practice of ignoring police lawsuits and insulating officers from the consequences of them.lr

The City Has Failed To Provide Meaningful Civilian Oversight Of The NYPD

86. The City has long been aware of the need for civilian oversight of the NYPD.

87. The Civilian Complaint Review Board ("the CCRB") was created an internal NYPD agency in 1953. Overtime the need for the CCRB to become a civilian run organization became apparent as the original NYPD run organization repeatedly failed to curb police misconduct. In 1987 the CCRB was converted into a hybrid organization with NYPD and non-NYPD investigators working together. Finally in 1993 the CCRB was turned into an all-civilian organization.

88. Nevertheless, the City is aware that the CCRB in its present form has failed to meaningfully curb police misconduct.

89. The City is aware that CCRB investigation procedures have many failings which often prevent findings of officer misconduct.

90. For example, the CCRB generally requires complainants to make in person, under-oath, statements before the CCRB will even begin an investigation, vastly diminishing the number of Complaints which are investigated.

91. The CCRB often finds complainants lack credibility based in part on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced. This practice often results in the CCRB failing to substantiate the most serious offenses merely because the Complainant also sought damages in a lawsuit.

92. The CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB.

93. When the crucial facts of an incident are disputed, the CCRB almost always issues a finding of "unsubstantiated". While a finding of an unsubstantiated complaint is not considered an exoneration of the officer, it serves the same practical purpose resulting in no possibility of discipline or consequences for the officer.

94. Despite the failings internal to the CCRB, the organization receives a massive number of complaints of police misconduct every year. The vast majority of those complaints is never fully investigated. And even where an investigation is completed, large percentages of such complaints are closed without an actual determination made of whether there was wrongdoing by the officer.

95. In 2020, the CCRB received 3,872 complaints within its jurisdiction. Only 30% of these cases were fully investigated. Of those cases investigated, 96 complaints (10%) were closed as the officer was unidentified, 93 (9%) were marked unfounded, 200 (20%) were exonerated, 293 (30%) were substantiated and 299 (30%) were unsubstantiated.

96. In 2019, the CCRB received 5055 complaints within its jurisdiction. Only 32% of these cases were fully investigated. Of those cases investigated, 106 complaints (7%) were closed as the officer was unidentified, 130 (8%) were marked unfounded, 338 (22%) were exonerated, 368 (24%) were substantiated and 597 (39%) were unsubstantiated.

97. In 2018, the CCRB received 4813 complaints within its jurisdiction. Only 30% of these cases were fully investigated. Of those cases investigated, 94 complaints (8%) were closed as the officer was unidentified, 92 (8%) were marked unfounded, 218 (18%) were exonerated, 226 (19%) were substantiated and 578 (48%) were unsubstantiated.

98. In 2017, the CCRB received 4849 complaints within its jurisdiction. Only 33% of these cases were fully investigated. Of those cases investigated, 110 complaints (8%) were closed as the

officer was unidentified, 87 (6%) were marked unfounded, 240 (18%) were exonerated, 258 (19%) were substantiated and 653 (48%) were unsubstantiated.

99. In 2016, the CCRB received 5172 complaints within its jurisdiction. Only 34% of these cases were fully investigated. Of those cases investigated, 98 complaints (6%) were closed as the officer was unidentified, 139 (9%) were marked unfounded, 257 (17%) were exonerated, 342 (23%) were substantiated and 678 (45%) were unsubstantiated.

100. The City is aware from the consistently high number of CCRB complaints that the NYPD continues to commit misconduct against civilians at disturbing rates.

101. The City has failed to take steps to ensure that complaints of officer misconduct are actually investigated and resolved with a factual finding of whether wrongdoing occurred.

102. NYPD officers are aware that even if a complaint is made about them, only a small percentage of those complaints will be investigated, and a significantly smaller number will result in an affirmative finding of substantiation or exoneration. As a result NYPD Officers do not fear a finding of misconduct from the CCRB.

103. Even in the tiny number of cases where the CCRB does substantiate charges, there are few meaningful repercussions for officers. This is because the CCRB has no enforcement mechanisms once making a finding against an officer. The CCRB can only make recommendations to the NYPD, once finding misconduct by an officer.

104. Of the 180,700 complaints investigated by the CCRB from 2000 to 2020, only two percent received some type of discipline from the NYPD, and less than one percent received serious discipline, like forfeiting vacation days, suspension, probation, or termination.

105. The NYPD overrode the CCRB's recommendation by imposing a lesser grade of discipline or imposing no discipline in 74 percent of substantiated cases.

106. 80% of substantiated complaints that received a disciplinary recommendation of "Charges and Specifications" from the CCRB – the most serious recommendation – did not result in serious discipline (forfeiting vacation days, suspension, probation, or termination) from the NYPD.

107. Officers of the NYPD are well aware that the possibility of ever facing significant consequences for committing police misconduct are remote. As such, fear of discipline has failed to deter police misconduct.

108. The individual officers involved in Plaintiff's arrest felt they could violate his rights without any repercussions as a result of the City's practice of failing to provide meaningful discipline for police misconduct.

109. These officers had personal experience that committing misconduct which led to substantiated CCRB charges and/or lawsuits resulting in significant economic liability to the City had no meaningful impact on their careers as NYPD officers.

110. These officers witnessed fellow officers suffer no meaningful consequences for committing misconduct as a result of police misconduct.

111. As a result, the officers involved in arresting Plaintiff felt they commit police misconduct without fear of any negative repercussions, and with the support of the City.

112. The City is aware that all of the aforementioned has resulted in a situation where the constitutional rights of civilians are routinely violated. Nevertheless, the City has failed to put into place meaningful reform to prevent such abuses. This failure caused the officers in this case to violate Plaintiffs' Constitutional rights.

**WHEREFORE**, plaintiff demands judgments against the defendants, jointly and severally, as follows:

A.	In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B.	Awarding plaintiff punitive damages in an amount to be determined by a jury;

C.	Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.	Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:	February 16, 2022
	New York, New York	Respectfully yours,

	_____
	Liakas Law, P.C.
	By: Nicholas Mindicino, Esq.
	65 Broadway, 13th Floor
	New York NY 10006
	212-937-7765

To:	The City Of New York

	Lieutenant Eric Dym

	Sergeant Natalie Bautista, Shield No. 1127

	Officer Lorvin Fernandez, Shield No. 9421

	Officer Jose Tejada, Shield No. 6150